## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| HARMONIA HOLDINGS GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 21-1704 C |
| | ) | |
| v. | ) | Filed: June 22, 2022 |
| | ) | |
| THE UNITED STATES, | ) | Re-issued: July 7, 2022* |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PERATON INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## OPINION AND ORDER

Plaintiff Harmonia Holdings Group, LLC ("Harmonia") filed this bid protest challenging the Internal Revenue Service's ("IRS" or "Agency") decision to cancel a solicitation to procure software application testing.  Harmonia was initially awarded a Blanket Purchase Agreement ("BPA") under the solicitation; however, the IRS stayed performance of all awards and initiated a corrective action after the filing of multiple bid protests at the Government Accountability Office ("GAO").  Several months into its corrective action, the IRS cancelled the solicitation entirely and awarded a sole source bridge contract to Defendant-Intervenor Peraton, Inc. ("Peraton"), with the intention of restarting the procurement by issuing a new solicitation.

The Court previously denied Harmonia's request for a preliminary injunction to prevent performance of Peraton's bridge contract during the pendency of this litigation.  Currently before

---

* The Court issued this opinion under seal on June 22, 2022, and directed the parties to file any proposed redactions by July 1, 2022.  As the parties did not propose any redactions, the Court reissues the opinion publicly in full.

the Court are the parties' Cross-Motions for Judgment on the Administrative Record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). For the reasons explained below, the Court finds that the IRS's decision to cancel the solicitation was not arbitrary, capricious, or otherwise unlawful. Accordingly, the Government and Peraton's Cross-Motions for Judgment are **GRANTED**, and Harmonia's Motion for Judgment is **DENIED**.

# I. BACKGROUND

## A. Findings of Fact

The IRS, through the Enterprise Systems Testing office ("EST") within the IRS's Information Technology organization, regularly tests its tax, administrative, and financial applications and systems in order to ensure that "IRS-developed code is operating as intended and free of defects prior to production implementation." Admin. R. 1, ECF Nos. 47, 50 ("AR"). EST employs contractor support to conduct this testing. *Id.* The incumbent contractor, Northrop Grumman (now Peraton), had been providing these services under a bridge contract from at least October 2018.[1] *Id.* The instant case involves the IRS's attempt to competitively procure the software application testing services through a multiple award BPA under the General Services Administration's ("GSA") Federal Supply Schedule 70 pursuant to Federal Acquisition Regulation ("FAR") Subpart 8.4, streamlined acquisition procedures. AR 14.

### 1. Initial Award to Harmonia and GAO Protests

In March 2020, the IRS issued Request for Quote No. 8110/GSA RFQ1420636, soliciting proposals from contractors to develop and execute software application testing to ensure effective

---

[1] Peraton acquired Northrop Grumman's federal information technology and mission support services business in February 2021. *See* Def.-Intervenor's Cross Mot. for J. Admin. R. at 7 n.2, ECF No. 59. Consistent with the Administrative Record, this opinion will refer to Northrop Grumman when referencing events prior to February 2021 and the Agency's concerns of bias; all other references will be to Peraton.

performance of IRS applications.  AR 27–28, 160.  The RFQ called for four BPAs to be awarded, including one set aside for a small business.  AR 14.  Award decisions would be based on six evaluation factors considered over three stages: (1) Mandatory Requirements, (2) Technical Approach, (3) Relevant Experience, (4) Past Performance, (5) Management Approach (via oral presentation), and (6) Price.  AR 108–10.  The first proposal evaluation stage was limited to Factor 1, to be assessed on a Pass/Fail basis.  AR 109.  The second stage involved consideration of Factors 2, 3, 4, and 6.  AR 109–10.  The eight-to-ten most highly rated proposals based upon Factors 2, 3, 4, and 6 advanced to the third stage, where remaining offerors made oral presentations on Factor 5.  AR 110.  Factors 2 through 5 were evaluated by a team of technical experts known as the Technical Evaluation Panel ("Panel"), which determined qualitative ratings (ranging from "Excellent" to "Unacceptable") for each factor and relayed its findings in a technical evaluation report.  AR 112–19.

The IRS received 33 proposals.  AR 1094.  Twenty-five offerors advanced to the second stage, of which nine were selected for oral presentations.  AR 1314.  After performing a best value tradeoff analysis among the remaining offerors, the Contracting Officer ("CO") awarded BPAs to Deloitte, Harmonia, Technatomy, and ASSYST.  AR 1316–25.  On December 17, 2020, three disappointed offerors—Northrop Grumman, Systems Engineering Solutions, and Citizant—each filed protests at the GAO, alleging that various aspects of the IRS's evaluation of proposals and award decision were flawed and/or unexplained.  *See* AR 1631–87, 1965–98, 2295–340.  Citizant also alleged irregularities in the CO's handling of the procurement, including that the CO ignored correspondence from Citizant and failed to inform Citizant that it would not be invited to oral presentations, thus denying Citizant the opportunity to protest its exclusion.  AR 2319–21.  Citizant

further alleged that an apparent leak of sensitive, procurement-related information occurred on the CO's watch.  AR 2320–21.

     2.    <u>The Agency Initiates a Corrective Action</u>

On December 31, 2020, the IRS informed the GAO that it would take corrective action and stay performance of the BPAs until such corrective action was completed.  AR 2365–66. Specifically, the IRS indicated that it would reevaluate the quotes of the three protestors for Factors 2 through 4 and reassess both Factor 5 and the price realism evaluation for the protesters and the other most highly qualified vendors.  AR 2365.  The IRS would then "issue a new technical evaluation report and source selection decision in accordance with the solicitation."  *Id.*  The IRS further explained its course of action following its reevaluation:

> If the Agency determines that the quotes of the current awardees continue to represent the best value to the IRS following these steps the Agency will lift the stay of performance on the BPAs, however if the new source selection decision concludes that one or more current awardees no long [sic] represent the best value to the IRS the Agency will cancel those awards and make new awards or issue additional BPAs if the Agency finds that it would be in the Government's best interest to make such awards.  The IRS may take any additional corrective action it determines to be appropriate.

*Id.*  In light of this notice, the GAO dismissed the three protests on January 19, 2021.  AR 2367–72.  The IRS then extended the bridge contract with Northrop Grumman to July 25, 2021, to allow time to execute the corrective action.  *See* Mem. from Acting Director, Office of Information Technology Acquisition ("OITA") at 1, ECF No. 51-1.

On March 3, 2021, the CO submitted the Panel's new technical evaluation report to her supervisor, the Chief of the Program Services Branch, Technology Acquisition ("Branch Chief"). AR 2373–74, 2902–3108.  Based on the new evaluation report, the CO again determined that awards should be made to Deloitte, Harmonia, Technatomy, and ASSYST.  AR 3109–23.

>    3.    <u>Management Identifies Problems with the Corrective Action</u>

Almost immediately, IRS management expressed concerns about how the Panel and CO were implementing the corrective action.  On March 4, 2021, the Branch Chief emailed her own supervisor, the Deputy Director for Technology Acquisition ("Deputy Director"), noting that "[t]he more I look at this, the more uncomfortable I am with it.  I am sure this will be protested again.  I think this really need [sic] to be cancelled and restarted from scratch."  AR 3124.  The Branch Chief and Deputy Director discussed the new evaluation report on March 8, 2021.  *Id.*  On March 17, 2021, the Branch Chief provided the CO with her review of the March evaluation report, raising several concerns with the Panel's evaluations.  AR 3126, 4083–84.  Specifically, the March report failed to indicate the location of relevant information within the RFQ's Performance Work Statement and respective vendor's proposal, details necessary for verification.  AR 3898, 4083; *see, e.g.*, AR 3920, 3938.  The report also contained many ratings indicating benefits the Government "may" or would "likely" receive from a proposal, language that, to the Branch Chief, demonstrated the evaluators' uncertainty as to a particular rating.  AR 3898, 4083; *see, e.g.*, AR 3899–900, 3904–05, 3910–11, 3915, 3922–24, 3934, 3949, 3951, 3971.  Further, the Branch Chief highlighted multiple instances where she found that the evaluators failed to adequately explain their findings, AR 3920, 3929, 3945, or asked improper questions at the original Factor 5 oral presentations, AR 3907, 3913, 3920, 3938, 3954.

In addition to these markups, the Branch Chief also noted that "[t]he source selection decision document is not supported by the evaluation factors and criteria," namely that it appeared the decision was based only on ratings for Factor 2 and "did not consider the other ratings or show why it would be clearly worth paying more for basically, equal proposals."  AR 4083.  The Branch Chief also observed that there was no "clear understanding of how testing would be coordinated

among the different vendors awarded a BPA," nor was there any indication of the EST program

office's expectations on such testing coordination. *Id.* Regarding the March evaluation report, the

Branch Chief concluded:

> Based on my current review, the re-evaluation of factors 2-4 are unacceptable and
> don't meet the evaluation criteria by explaining the benefits that are expected to be
> obtained from strengths and stating the requirement of the [Performance Work
> Statement]. Factor 5 was not re-evaluated but need [sic] to be because questions
> were asked outside of the criteria provide [sic]. Recommend working with the PIL
> section to gain insight for best practices and coaching in re-accomplishing this
> factor. The Decision document does not appear to focus on the actual evaluation
> criteria, but focus [sic] on Factor 2 for making the overall decision. Last, based on
> the response of the [program office] on the testing and vendors needed to work
> together, this whole process may need to start over from scratch. At the minimum,
> the evaluations of factors 2–4 need to be corrected/updated and Factor 5 needs to
> be re-accomplished.

AR 4083–84.

4.   <u>Management Recognizes Integrity Issues; Panel Remains Unable to Draft
     Defensible Report</u>

On March 25, 2021, acting on the Branch Chief's request, IRS counsel forwarded

Citizant's December 2020 GAO protest to the Deputy Director, flagging allegations about the

CO's previous conduct in the procurement. AR 4100.[2] The Deputy Director asked whether the

allegations could be substantiated and noted that, if true, the allegations were "extremely troubling

and represent a total disregard for transparency and a black-eye for our agency's reputation." *Id.*

The Deputy Director further indicated that he "believe[d] that this source selection should start

---

[2] In particular, Citizant alleged that the CO ignored its questions "as to how award and/or
unsuccessful offeror notices would be sent out," which Citizant considered a critical issue "as they
had not received such notifications for several proposals submitted via GSA e-Buy." AR 4126.
Citizant also alleged that information specifying the initial four awardees (Deloitte, Harmonia,
Technatomy, and ASSYST) was leaked and posted on a third-party website nearly a month before
Citizant received official notice from the CO, indicating to Citizant that the CO "lost control of
this procurement." *See* AR 4126–27. Finally, Citizant complained that it was "never notified that
it was not being invited to oral presentations," thus "denying it the right to protest the decision at
that critical time." AR 4127–28.

over" with a new contracting officer. *Id.* The Deputy Director also brought this information to the attention of his own supervisor, the Acting Director of OITA ("Acting Director"). AR 4098.

Earlier that same week, the CO notified offerors that it was reconducting the Factor 5 oral presentations, scheduled for April 7–8, 2021. AR 4085–97. Citizant, one of the GAO protestors, did not receive such an invitation and complained to IRS legal counsel that it was being treated unfairly, as earlier notification to other offerors gave them more time to prepare, and expressed further frustration with the CO. *See* AR 4155–57. In response, IRS counsel indicated that notice of oral presentations was sent out prematurely. AR 4156. IRS counsel further indicated that, going forward in the corrective action, any communications coming from the IRS would first be subject to his review and that he would use any such review "to ensure that all parties are treated fairly and get appropriate time to prepare for any future steps." AR 4155.[3]

On March 26, 2021, the CO wrote a lengthy email to the Deputy Director regarding a recent instruction from the Branch Chief "to cease proactively coordinating and planning for a time in the future for the reevaluation of **Factor 5 – Management Approach via oral presentations** for the EST BPA's." AR 4151. The CO expressed frustration at the cancellation of the oral presentations scheduled for April 7–8, 2021, and sought clarification on how to proceed with the reevaluation, noting that further delays could result in having to issue another bridge contract. AR 4151–52. In his response, the Deputy Director explained that additional oversight had been added due to both the "problematic history" of the procurement and the broader failure of staff to follow procedures to mitigate successful bid protest risks, and he pointed out that the Branch Chief had

---

[3] The Acting Director later indicated that by March 2021 the IRS "had begun to receive communications from industry, indicating a lack of trust in the IRS' [sic] ability to execute the EST procurement." ECF No. 51-1 at 1.

"some serious concerns" about the state of the procurement.  AR 4150–51.  The CO subsequently cancelled oral presentations.  AR 4150, 4153–54.

On April 14, 2021, the CO submitted a response to management's review of the corrective action, including a revised evaluation report, to the Branch Chief.  AR 4158, 4693–927.[4]  The Branch Chief still had concerns after reviewing the April report, responding with a seven-point summary:

> 1.  P. 20 for Deloitte states Quotes strengths outweigh any weaknesses then doesn't mention any weaknesses….perhaps you can consider taking out any mention of weaknesses, if there aren't any.
> 2.  Factor 2 Executive Summary – how/why is this extremely beneficial?
> 3.  Task Area One – how will this provide substantial benefit?
> 4.  Deloitte and Harmonia are both rated Good for Factor 2, Harmonia's ratings seem to put them more in the "Acceptable" range.  How is Deloitte with only Significant Strengths and Strengths at the same level as Harmonia who has many weaknesses and strengths?
> 5.  IBM also seems more Acceptable than Good.  They have no significant strengths.
> 6.  Throughout the document, for any factor where it is stated that it's a benefit to the government, please describe the benefit.
> 7.  Throughout the document, please review the ratings for all vendors and confirm the rating matches the amount of significant strengths, strengths, weaknesses, etc.
>
> It may be beneficial to work with a team member to resolve in real time.

AR 4928.  The CO forwarded these concerns to the Panel on April 27, 2021, proposing to reconvene in the next few days and move the procurement forward.  AR 4930.  The CO next communicated with the Branch Chief on May 17, 2021, seeking guidance from management regarding next steps and noting that the current bridge contract with Peraton would expire on July 25, 2021, and that the "[t]he Program Office cannot sustain a lapse in service."  AR 4932.

---

[4] The CO included a "Memo to File," dated March 25, 2021, that acknowledged and accepted the recommendations made by the Branch Chief.  AR 4159–61.  However, in response to the Branch Chief's concern that the "whole process may need to start over from scratch," the CO stated that "[b]ased on the needs of the IRS for this critical service the recommendation to restart the process is **declined**" and that the corrective action would be completed.  AR 4161.

5.      Management Considers Options with Bridge Contract Expiration Looming

By this point, the Chief Procurement Officer at IRS had requested a meeting with the Acting Director to discuss the procurement.  AR 5149.  The Acting Director, Deputy Director, and Branch Chief met on May 20, 2021.  AR 5149–55; ECF No. 51-1.  Presentation slides prepared by the Branch Chief reflect her conclusion that the Panel had been "unable to provide a complete [evaluation report] addressing all factors."  AR 5152.  Namely, evaluation ratings were not supported: "strengths" did not show how the government would benefit and "weaknesses" did not show how the government would be assuming risk.  AR 5153; *see* ECF No. 51-1 at 1.  According to a memorandum prepared by the Acting Director for the purpose of this litigation, an OITA management review concluded that the Panel "was not likely to draft a legally sufficient [evaluation report] by July 25, 2021, based on the limited progress being made."  ECF No. 51-1 at 1.  Additionally, Factor 5 oral presentations remained unfinished, and the IRS's legal office had concerns that the Panel was biased against Northrop Grumman.  AR 5153–54; ECF No. 51-1 at 1.  According to the Acting Director, "[a]nother matter that was discussed was the lack of vendor confidence in the fairness of the source selection process and the probability that any contract awards would likely be immediately protested."  ECF No. 51-1 at 1.

The presentation put forth two possible solutions: (1) complete the corrective action, notify the offerors, and see if the reevaluation is protested; or (2) cancel the award, start the acquisition process over, and issue a sole source bridge contract to allow time for recompetition.  AR 5154.  Based on this meeting, the Acting Director concluded that "a lapse in services was inevitable" and that a decision should be made quickly in order "to process a bridge contract to avoid a service lapse, as well as allow a new Contracting Officer appropriate time to complete a new acquisition."  ECF No. 51-1 at 2.  The Acting Director subsequently met with IRS legal counsel and executives

from the EST program office, explaining his intent to cancel the procurement given the Panel's continued inability "to draft a defensible [report], despite months of work, and that industry had lost confidence in this procurement." *Id.* The Acting Director also solicited alternative courses of action from legal counsel and EST program office executives but concluded that there were no viable alternatives. *Id.*

6. <u>The Agency Cancels, Issues Another Bridge Contract to Peraton</u>

Accordingly, the Acting Director determined that "the most effective and efficient way [to] ensure integrity of the procurement process, meet the spirit of the IRS' [sic] identified corrective action, execute a procurement that will meet the agency's needs, and regain the trust and confidence of industry was to start over." *Id.* The Acting Director further intended to assign a new contracting officer and a new evaluation panel of technical experts. *Id.* On May 26, 2021, the Acting Director informed the Deputy Director and the Branch Chief of his decision to cancel and the need for another bridge contract. AR 4938.

The Agency then terminated the four initially awarded BPAs, including Harmonia's award. AR 4940–51. On July 22, 2021, the IRS filed a Justification for an Exception to Fair Opportunity for a bridge contract to Peraton "to provide continued services while the re-compete process is completed," as the need to avoid a lapse in service was urgent enough that "providing a fair opportunity would result in unacceptable delays." AR 4952. Accordingly, effective July 26, 2021, the Agency awarded a sole-source bridge task order contract to Peraton to maintain continuity of services during the new solicitation process, with a 12-month base period followed by three four-month option periods. AR 5054–136; *see* AR 5137–40 (public notice).

**B.      Procedural History**

On August 17, 2021, Harmonia filed this bid protest, along with a motion for a preliminary injunction seeking to prevent the Agency from allowing Peraton to perform the current bridge task order.  *See* Pl.'s Compl., ECF No. 1; Pl.'s Mot. for Prelim. Inj., ECF No. 3.  Harmonia subsequently amended its complaint.  The Amended Complaint claims that the Agency's cancellation and sole source award to Peraton was arbitrary and capricious and violated the Agency's duty to consider bids fairly and honestly in accordance with FAR 1.602-2.  Pl.'s Am. Compl. ¶¶ 23–31, ECF No. 28.

The Court denied Harmonia a preliminary injunction on September 27, 2021, explaining that, while the Court likely had jurisdiction over Harmonia's cancellation and corrective action claim, Harmonia failed to demonstrate that the Court had jurisdiction to review or enjoin the performance of the task order awarded to Peraton.  Op. & Order Den. Prelim. Inj. at 12, ECF No. 38 (public version).  With respect to the claim challenging the cancellation, the Court found that Defendant put forward reasons that could potentially provide a rational basis for cancelling the solicitation, but that Harmonia raised legitimate concerns about the sufficiency of the Agency's explanation in support of its decision and thus had demonstrated some likelihood of success on the merits.  *Id.* at 14–15.  However, the Court held that all remaining preliminary injunction factors weighed against Harmonia.  *Id.* at 15–19.

Defendant subsequently moved to voluntarily remand the case so that the Agency could elaborate on its cancellation decision. *See* Def.'s Mot. for Voluntary Remand, ECF No. 39 (public version). The Court denied the remand motion, explaining that any request to submit extra-record material must be made instead via a motion to supplement the administrative record.  *See* Mem. Op. & Order Den. Def.'s Mot. to Remand, ECF No. 43.  On January 25, 2022, the Court granted

Defendant's subsequent Motion to Supplement the Administrative Record with the memorandum from the Acting Director (ECF No. 51-1) explaining the process and rationale behind his decision to cancel.  *See* Mem. Op. & Order Granting Def.'s Mot. to Suppl. Admin. R., ECF No. 57 (public version).

The parties have since moved for Judgment on the Administrative Record under RCFC 52.1, with Harmonia requesting the Court permanently enjoin the cancellation of the solicitation and its previously awarded BPA.  *See* Pl.'s Mot. for J. Admin R., ECF No. 56; Def.'s Cross Mot. for J. Admin. R., ECF No. 58; Def.-Intervenor's Cross Mot. for J. Admin. R., ECF No. 59.  The Court held oral argument on March 29, 2022.

Harmonia argues that the Agency's decision to cancel and restart the procurement from scratch was arbitrary and capricious for multiple reasons.  First, any Agency concerns as to "integrity issues" surrounding the procurement, specifically as to allegations that the CO was unfair and/or incompetent in dealing with offerors and that, under the CO's watch, the identity of the initial awardees was prematurely leaked, do not support cancellation because the Agency was slow to address them and never fully investigated the allegations.  ECF No. 56 at 15–16, 19–20; Pl.'s Reply at 2–3, ECF No. 60.  Second, the Agency's concern about making a timely award to avoid a service interruption was irrational where the Agency itself moved slowly with the corrective action and was close to finishing when management abruptly decided to cancel instead of considering more reasonable alternatives.  ECF No. 56 at 16, 20–21.  Third, the Branch Chief's criticisms of the Panel's evaluations were fundamentally erroneous and inconsistent with the evaluation criteria, therefore making cancellation based on her concerns irrational.  *Id.* at 21–23; ECF No. 60 at 3–6.  Moreover, any Agency concerns about "bias" against Northrup Grumman are simply unsupported in the record.  ECF No. 56 at 22.  Finally, Harmonia argues that outright

12

cancellation was inconsistent with the Agency's representations to the GAO, where the Agency stated it would cancel awards only if it determined upon reevaluation that one or more current awardees no longer represented the best value. *Id.* at 23–24.

In response, Defendant and Peraton assert that concerns as to industry's perception of the procurement's integrity were legitimate and ripe for consideration as the Panel's struggles to produce a defensible evaluation report forced management to discuss its options. ECF No. 58 at 24, 26–27; ECF No. 59 at 28. They claim Harmonia's assertion that the corrective action was almost finished at the time management decided to cancel is simply inconsistent with the record. ECF No. 58 at 25–26; ECF No. 59 at 30. Further, Defendant notes that the Agency did consider pressing forward with the procurement; but regardless, Harmonia's belief that the Agency should have considered and chosen an alternative to cancellation does not render the Agency's choice arbitrary and capricious. ECF No. 58 at 27–28. Nor was cancellation inconsistent with the Agency's representation to the GAO. ECF No. 59 at 27. And while they concede evidence of bias against Northrup Grumman in the record may be scant, Defendant and Peraton argue there is sufficient support for bias to be one factor among many that supported the Agency's decision to cancel. ECF No. 58 at 29; ECF No. 59 at 25–26. Finally, Defendant contends the Branch Chief's concerns about the Panel's evaluations were well-founded and within her technical expertise, and any attempt by Harmonia to have the Court second-guess such technical judgments is inappropriate. ECF No. 58 at 28.

## II.   STANDARD OF REVIEW

A motion for judgment on the administrative record pursuant to RCFC 52.1 is "properly understood as . . . an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The Court limits its review to the administrative record and "asks whether,

given all the disputed and undisputed facts, a party has met its burden of proof." *Savantage Fin. Servs., Inc. v. United States*, 150 Fed. Cl. 307, 317 (2020) (citation omitted).  In contrast to the standard for summary judgment, a genuine issue of disputed fact does not prevent a court from granting a motion for judgment on the administrative record. *See Bannum*, 404 F.3d at 1357.

Where a plaintiff asserts a bid protest claim, the Court reviews the challenged agency decision pursuant to the familiar Administrative Procedure Act ("APA") standard of review.  28 U.S.C. § 1491(b)(4).  In assessing whether such decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), the Court must determine whether: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure," *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (collecting cases). Challengers bear the "'heavy burden' of showing that the award decision 'had no rational basis.'" *Id.* at 1333 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)).  A challenge alleging an unlawful procurement procedure requires plaintiffs to prove "a clear and prejudicial violation of applicable statutes or regulations."  *Id*. (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

The arbitrary-and-capricious standard in the bid protest context is "highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  There is no "universal test" as to the sufficiency of an agency's explanation for its decision and "no one factor is dispositive." *Yang Enters., Inc. v. United States*, 156 Fed. Cl. 435, 449 (2021) (citing *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 111–12 (2020)).  Rather, an agency decision will be upheld "if the agency substantiates its conclusion with *some* support." *Id.* (collecting cases).  "Courts have found an agency's decision to be arbitrary and capricious when the agency

'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)).

Courts apply this standard when considering an agency's decision to cancel a solicitation. *See, e.g.*, *Croman Corp. v. United States*, 724 F.3d 1357, 1363–65 (Fed. Cir. 2013); *Veterans Contracting Grp., Inc. v. United States*, 920 F.3d 801, 808 (Fed. Cir. 2019). Indeed, because the review of a contracting officer's decision to cancel is highly deferential, *see MSC Indus. Direct Co. v. United States*, 140 Fed. Cl. 632, 650 (2018) (quoting *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 125 (2010)), the arbitrary-and-capricious standard may be more difficult to prove, *see Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004). An agency, however, does not have "unfettered discretion to cancel procurements." *126 Northpoint Plaza Ltd. P'ship v. United States*, 34 Fed. Cl. 105, 112 (1995).

## III. DISCUSSION

Harmonia fails to demonstrate that the Agency's decision to cancel lacked a rational basis or was contrary to law. The Agency had legitimate concerns that justified cancelling the solicitation, all of which—except its concern as to bias against Northrop Grumman—are sufficiently grounded in the record. Contrary to Harmonia's assertions, the process and timing of the Agency's decision also was not arbitrary and capricious, nor did the Agency fail to consider alternatives to cancellation. Because Harmonia's claim that the Agency violated FAR 1.602-2 mirrors its arbitrary-and-capricious claim, it also fails for the same reasons. Accordingly, Harmonia is not entitled to judgment or the injunctive relief it seeks.

**A.**     **The Agency's Reasons for Cancelling are Rational and Supported by the Record, and the Agency's Process and Timing were Not Arbitrary and Capricious.**

In explaining the rationale for his decision to cancel the solicitation, the Acting Director identified two factors: (1) the Panel's continued inability to draft a defensible technical evaluation report, despite months of work and with the July 25 lapse-in-service deadline looming, and (2) a lack of confidence from industry given the appearance of integrity issues in the procurement.  *See* ECF No. 51-1 at 2.  He also highlighted other factors considered, including concerns expressed by the IRS legal office that the Panel was biased against Northrop Grumman.  *Id.* at 1.  These reasons are all supported by the record, to varying degrees, and are rational grounds for cancellation. Likewise, the Court finds that Harmonia has failed to demonstrate that the Agency's decision-making process was arbitrary or capricious.

1.     The Branch Chief's Review of the Panel's Reevaluation Reports was Reasonable.

The Acting Director rationally concluded that the Panel's inability to draft a defensible reevaluation report supported cancellation.  That conclusion was based on the Branch Chief's assessments of the Panel's evaluations.  Her assessments were not unreasonable or erroneous. Where a protestor challenges a contracting agency's evaluation, the Court will examine the evaluation only to ensure reasonableness and consistency with the evaluation criteria.  *See Galen Med. Assocs.*, 369 F.3d at 1330 (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).  Harmonia bears "the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious."  *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 384 (2003) (collecting cases), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

Here, in reviewing the Panel's March evaluation report, the Branch Chief identified numerous issues with the Panel's ratings that would make subsequent review by the CO and

management challenging and would be difficult to defend if protested: specifically, ratings offered conclusions without detailed explanations, did not include citations to evaluation criteria and vendor proposals, and contained equivocal, inconclusive language.  *See* AR 3898, 3920, 3929, 3945; *see also* AR 4083 ("There is no way to ensure the comments are in accordance with the requirement because the TEP didn't identify where the information is located in the PWS. This needs to be accomplished so the CO can verify all information and the reviewers can easily check on information").  The Court cannot say that these criticisms were irrational.  The Branch Chief's comments accurately reflect language and missing details from the ratings in the March evaluation report, errors that appear throughout the draft.  *Compare id.*, *with* AR 3899–900, 3904–05, 3910–11, 3915, 3922–24, 3934, 3938, 3949, 3951, 3971.

The Branch Chief also identified inconsistencies in Factor 5 questions put to presenters at the oral presentations and multiple Factor 5 questions that she characterized as "inappropriate" for being outside the evaluation criteria.  These criticisms are neither irrational nor erroneous.  Indeed, the ratings indicated that some of the Panel's questions differed among offerors or, at the very least, the ratings were unclear as to whether questions were consistent among offerors.  *See* AR 3907, 3920, 3954.   Some questions also were in fact outside the stated evaluation criteria. *Compare* AR 3913, 3938, *with* AR 118–19.  At oral argument, Harmonia argued that the Branch Chief's review of the March evaluation report misapplied the Factor 5 evaluation criteria.  It claimed the Branch Chief's failure to comment on the Factor 5 ratings in the Panel's April report (which remained unchanged from the previous March report) indicated an implicit admission that her comments on the previous draft were wrong.  Harmonia misreads the Administrative Record. The Branch Chief did not comment on the unchanged Factor 5 rating when reviewing the April report because a fresh round of Factor 5 presentations had not yet taken place.  Therefore, the Panel

had not yet reevaluated Factor 5 and there was no change to the Factor 5 ratings for the Branch Chief to review.  *See* AR 4085–97 (CO notification of new Factor 5 presentations for April 7–8, 2021); AR 4150–54 (cancellation of April 7–8 presentations due to application of additional oversight measures imposed by management).[5]

Harmonia further fails to demonstrate anything unreasonable about the Branch Chief's review of the Panel's April evaluation report, which raises similar concerns as her review of the March report.  AR 4928.  Specifically, the Branch Chief noted additional conclusory explanations of ratings, *see* AR 4715–16, 4722–23, and questioned ratings that did not seem to accurately reflect a proposal's particular strengths and weaknesses, *see* AR 4710, 4715–18, 4722–24, 4728–30. Again, the Court finds none of these critiques to be irrational.  Language in evaluations that the Branch Chief cited as conclusory indeed appears conclusory, and her comments about various Factor 2 ratings are not inaccurate.

More importantly, many of the Branch Chief's stated concerns reflect her expert technical judgments made during a qualitative review of the Panel's evaluations and ratings.  Harmonia's objections to her comments assume a level of scrutiny that is inappropriate for this Court to apply and, as Defendant points out, fail to acknowledge the deference owed to agency officials' technical expertise.  *See L-3 Commc'ns EOTech, Inc. v. United States*, 87 Fed. Cl. 656, 664 (2009) ("The court gives great deference to an agency's technical evaluation of an offeror's proposal.").  Absent erroneous findings or reasoning that would indicate that the cancellation was the result of irrational

---

[5] Harmonia also objects to the Branch Chief's concerns in her review of the March evaluation report about integration among BPA awardees.  AR 4083–84; ECF No. 60 at 5–6. However, this concern appears only in her review of the March report.  Nowhere is it mentioned in either her review of the April report, the presentation slides from management's May 20 meeting, the Acting Director's email indicating his decision to cancel, or the Acting Director's memorandum.  *See* AR 4083–84, 4928, 2938, 5149–54; ECF No. 51-1.  Thus, the Court finds that this particular concern is not significant to the cancellation decision.

decision-making, the Court will not nit-pick the "minutiae of the procurement process," nor will it serve as the arbiter between the Panel and Agency management, as Harmonia's arguments assume. *See Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1384 (Fed. Cir. 2022) (quoting *E.W. Bliss*, 77 F.3d at 449).  The Court declines to second-guess the Agency's appraisal of its own technical evaluations.

       2.       <u>The Acting Director's Reliance on Integrity Issues was Not Irrational.</u>

The Acting Director also rationally based his cancellation decision on concerns about the integrity of the procurement.  Harmonia's argument to the contrary based on its objections to the Agency's pace, timing, and lack of investigation in addressing "integrity issues" is unavailing.  As an initial matter, the Court finds that the record supports the Agency's cited integrity concerns: (1) Citizant's GAO protest included a seemingly credible allegation that sensitive procurement information was leaked from within the Agency prior to the December 2020 BPA announcement, AR 4126–27; and (2) the CO initially failed to contact Citizant to schedule a critical Factor 5 oral presentation during the corrective action—an issue similar to one Citizant had previously experienced with the CO, AR 4127–28, 4155–57.[6]  At the time the Acting Director decided to cancel and resolicit the procurement, the allegations of a leak remained unresolved and the CO had clearly failed to communicate critical information to Citizant on multiple occasions, calling the procurement's fairness into question.  These issues, along with the accompanying frustrations voiced by counsel for Citizant, AR 4155, support the Acting Director's concerns that a cloud hung over the procurement and that awards would likely be protested, as well as his conclusion that it was necessary to install a new contracting officer and evaluation panel.  *See* ECF No. 51-1.  Faced with these "integrity issues," the Court finds that it was not arbitrary or capricious for the Agency

---

[6] These allegations were serious enough for the Deputy Director to consider them "extremely troubling" and a "black-eye" for the Agency's reputation.  AR 4100.

to decide that it should restart the procurement from scratch. *See, e.g.*, *Sierra Nev. Corp. v. United States*, 107 Fed. Cl. 735, 753 (2012) (finding it "rational and reasonable" that the Air Force filed a notice of corrective action instead of defending what it perceived to be a flawed procurement due to apparent bias and poor documentation).

Harmonia's main objection is that the Agency waited until March 2021 to internally discuss the leak allegations made in the GAO protest filed in December 2020. According to Harmonia, if the Agency were truly concerned, it would have discussed and investigated these allegations earlier in the corrective action, or even before deciding to take the corrective action. Instead, management waited until late March 2021 to flag the allegations and then cited them as support for cancellation two months later, without having investigated or resolved them. ECF No. 56 at 15–16, 19–20; ECF No. 60 at 2–3.

The relevant timeline is as follows: following the initial awards (including to Harmonia), Citizant, along with other unsuccessful offerors, filed its protest at the GAO on December 17, 2020. AR 1631–2364. On December 31, the Agency notified the GAO that it would take corrective action. AR 2365–66. The GAO dismissed the protests on January 19, 2021. AR 2367–72. On March 3, 2021, the CO sent a revised evaluation report and award decision to the Branch Chief. AR 2373–3123. The Deputy Director and Branch Chief discussed the Branch Chief's concerns with the CO's submission on March 8, AR 3124–25, and the Branch Chief sent her review of the evaluation report to the CO on March 17, AR 3126–4084. Citizant's protest, with the relevant allegations highlighted, was circulated among Agency management on March 25 and 26. AR 4098–101. The CO submitted another revised evaluation report and award decision on April 14, 2021. AR 4158–927. The Branch Chief responded with more concerns and feedback on April 22. AR 4928–29. The CO forwarded the Branch Chief's feedback to members of the

Panel on April 27, AR 4930–31, and requested guidance as to next steps on May 17, 2021, AR 4932. The Chief Procurement Officer requested a meeting on the status of the procurement as of May 14. AR 5149. The Acting Director, Deputy Director, and Branch Chief then met to discuss the status of the procurement on May 20, AR 5149–55, and the Acting Director informed the Branch Chief and Deputy Director of his decision to cancel on May 26, AR 4938.

While it may have been reasonable for the Agency to act on these "troubling" allegations sooner, that does not mean Agency management acted unreasonably by identifying and circulating this issue in late March, at which point they had been able to review a new evaluation report from the Panel and a new proposed award decision from the CO. The Court cannot say it was arbitrary or capricious for management to reassess the procurement as a whole after having subsequently determined that the new evaluation report was not likely legally sufficient, including going back to further reexamine the protests that caused the Agency to initiate its corrective action in the first place.[7]

This circumstance also explains the lack of evidence of an in-depth investigation by the Agency into Citizant's allegations of a leak, first flagged in late March 2021, as the CO and Panel were preparing to submit the revised reevaluation report. As the record demonstrates, the entire procurement was floundering at this point: awards had been protested at the GAO three months earlier, leading the Agency to stay performance of the BPAs and institute a corrective action; Agency management believed the Panel's March evaluation report was not likely defensible, leading the Branch Chief to conclude that "this whole process may need to start over from scratch,"

---

[7] The fact that this order of operations is never expressly laid out by the Acting Director is of no consequence where the record as a whole allows the Agency's path to be "reasonably discerned." *See SigNet Techs., Inc. v. United States*, 154 Fed. Cl. 396, 408 (2021) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

AR 4083–84; the CO had again failed to properly notify Citizant, one of the December 2020 GAO protestors, of Factor 5 oral presentations, AR 4155–57; and a potential lapse in service was only four months away.  The Agency spent the next two months implementing additional oversight, AR 4148–52, such as assigning Agency legal counsel to review all of the Agency's external communications associated with the procurement, AR 4155–57; reviewing the revised evaluation report submitted in April, AR 4928; and deliberating on the direction of the procurement and the CO's role moving forward, AR 5149–55.  Given the actions taken and the short timeframe available, the Court finds that it was not irrational to cite the allegation of a leak as an "integrity issue" justifying cancellation while simultaneously forgoing an in-depth investigation, especially where (1) the underlying allegation was credible on its face and just one of many problems with the procurement; (2) a protestor had lodged other, unrelated complaints about the CO that raised questions about the fairness of the process; and (3) a lapse in critical services was just two months away.  In other words, it was not irrational to prioritize urgent, big-picture questions about the direction of the procurement rather than embarking on an intensive investigation into the CO's handling of the procurement, particularly where assignment of a new contracting officer was being considered based on an alternative reason.

Absent any error by the Agency in this respect, the Court again declines to wade into "the minutiae of the procurement process," including "*the timing of various steps* in the procurement, which involve discretionary determinations of procurement officials that a court [should] not second guess."  *E.W. Bliss*, 77 F.3d at 449 (citing *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958 (Fed. Cir. 1993)) (emphasis added); *see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996)) ("*De minimis* errors in the procurement process do not justify

relief."). Nor will it substitute its own judgment for that of the Agency on how best to respond to allegations involving the procurement's integrity. *See Turner Constr. Co., Inc. v. United States*, 645 F.3d 1377, 1383 (Fed. Cir. 2011) (citing *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)).

Finally, Harmonia hints throughout its briefs and argument that any concern regarding integrity issues was not genuine. However, it makes no showing that the Agency acted in bad faith or with pretextual motive by waiting to discuss Citizant's allegations until after first receiving the Panel's March evaluation report, nor does an independent review of the record indicate as much. *Savantage Fin. Servs., Inc. v. United States*, 86 Fed. Cl. 700, 703 (2009) (collecting cases) ("Significant to the court's consideration . . . is the strong presumption that government officials act correctly, honestly, and in good faith when considering bids, and the well-settled notion that courts should respect acts of procuring officials when they exercise their discretionary functions."), *aff'd*, 595 F.3d 1282 (Fed. Cir. 2010). As Peraton notes, Harmonia also fails to provide any authority suggesting that an Agency can waive or forfeit its ability to assess and make decisions based on problems in a procurement if such problems are not identified and addressed within a certain amount of time. *See* ECF No. 59 at 28,

The Court finds no aspect of the Agency's "integrity" rationale arbitrary or capricious.

3.   The Agency's Bias Concerns Offer Little Support for Cancellation.

A reasonable suspicion of bias by its own procurement officials may support an Agency's decision to cancel an award. *See, e.g.*, *Sierra Nev.*, 107 Fed. Cl. at 753–55. Harmonia objects to the Agency's concern about the Panel's potential bias against the incumbent, Northrop Grumman, as justification for cancelling the procurement, arguing that the record is simply devoid of facts indicating such bias. ECF No. 56 at 22.

Harmonia's argument has merit.  As Peraton concedes, "[t]here is a notable dearth of information in the record on this point."  ECF No. 59 at 25.  Instances in the record where bias is expressly raised are limited only to the presentation from management's May 20 meeting, AR 5153 ("GLS has concerns that the TEP may be biased against [Northrop Grumman].") , and the Acting Director's memorandum, ECF No. 51-1 at 1 ("By May 2021, additional concerns consisted of . . . indications of potential bias against one of the vendors.").  In its cross-motion, Defendant also points to what the Branch Chief thought was an inappropriate question posed by the Panel to Northrop Grumman at its Factor 5 oral presentation as an instance where such bias may be inferred. ECF No. 58 at 29 (citing AR 3938) (documenting question about Northrop Grumman's ability to transfer knowledge as the incumbent to a new vendor in the event it did not receive a BPA).

If the Agency cited bias as its only reason to cancel, the evidence in the record would likely be insufficient to support the cancellation decision.  In *Sierra Nevada*, for example, the court found that there was "ample evidence" to support the Air Force's concern that the procurement in question "was likely tainted by bias."  107 Fed. Cl. at 753.  In particular, the record showed that the relevant contracting officer failed to follow certain procedural steps in reopening discussions with a bidder and appeared to exhibit favoritism in communications with the bidder, and that evaluations for the bidder appeared higher than they should have been and were supported only by conclusory written explanations.  *See id.* at 740–45.  Counsel for the Air Force flagged these issues and explicitly documented them as potential indications of bias in the procurement.  *See id.* at 743 ("After marshaling all of the evidence, Brig. Gen. Dennis arrived at several conclusions, including . . . bias exhibited in favor of [Sierra Nevada].").

Here, there is no similar evidence to support the bias concern.  The record includes a few documented complaints of bias (potentially from one source: the IRS legal office), no indication

24

of *why* Agency officials were concerned about bias, and only one substantive example (an inappropriate question at oral presentations) from which Defendant suggests bias may be inferred but which is never identified by an Agency official as the actual reason underlying its bias concern. The Court concludes that while bias—or even the mere appearance of bias—is a legitimate reason to cancel a solicitation, *see Sierra Nev.*, 107 Fed. Cl. at 755, there is insufficient evidence of such bias in the record to provide more than nominal support for the Agency's decision to cancel. Because the other grounds for the Acting Director's decision are rational, however, the Court's ruling on bias does not otherwise justify setting aside the cancellation decision. *See Fogo De Chao (Holdings), Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1149 (D.C. Cir. 2014) (holding that where an agency decision is based on multiple independent grounds a court can affirm the agency on APA review "so long as any one of the grounds is valid").

4.    Harmonia's Remaining Procedural Objections are Unpersuasive.

Harmonia's remaining arguments challenge the Agency's process in deciding to cancel the solicitation.  Harmonia asserts that the Agency failed to consider other reasonable options short of cancellation, ECF No. 56 at 16, which was unreasonable given that the corrective action was "painstakingly close" to being finished, *id.* at 20 ("[A]s soon as the Agency's program expressed concerns about a potential lapse in service, the Agency threw up its hands and abandoned ship."). Harmonia also argues that cancellation was inconsistent with the Agency's notice of corrective action in the GAO protest, which it claims committed the Agency to either: (1) make a new award; (2) issue additional BPAs; or (3) cancel only where the Agency determined upon reevaluation that one or more current awardees no longer represented the best value to the Agency.  *Id.* at 23.  The Court is not persuaded.

The record shows that the Agency did, in fact, consider at least one option that did not involve cancellation. The presentation slides from the May 20, 2021, meeting of the Acting Director, Deputy Director, and Branch Chief clearly indicate that pressing ahead with completion of the corrective action was presented as a possible solution alongside cancellation. AR 5154. OITA management, however, concluded that the Panel "was not likely to draft a legally sufficient [report] by July 25, 2021, based on the limited progress being made." ECF No. 51-1 at 1. This is consistent with the caveat in the presentation slide, warning that another bridge contract may be necessary under either option considered. AR 5154. The Acting Director's memorandum further states that, even after this meeting, he met with various stakeholders and "solicited from them any alternative courses of action" but subsequently determined that "[n]o viable alternatives were available." ECF No. 51-1 at 2. Again, there is no indication in the record that these representations are insincere. *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002) (clear and convincing evidence is necessary to overcome "the strong presumption that government contract officials exercise their duties in good faith").

Nor does the existence of other reasonable options (or even better options) make the Agency's decision to cancel arbitrary and capricious. Under the APA standard of review, an agency is not required to address every conceivable option; instead, it has discretion to pick one reasonable option, with the obligation to "adequately explain its reasoning for doing so." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998 (Fed. Cir. 2018) (citing *Chapman Law Firm Co. v. Greenleaf Constr. Co., Inc.*, 490 F.3d 934, 938 (Fed. Cir. 2007)); *see Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). As the Acting Director explained, and as the record supports, concerns about whether the Panel could competently complete a legally sufficient report coupled

with concerns about the integrity of the procurement adequately explain why the Agency chose to cancel the procurement altogether rather than pushing forward.  And these are legitimate concerns: "the government has a substantial interest in not creating opportunities for litigation[.]"  *See, e.g.*, *Asset Prot. & Sec. Servs., L.P. v. United States*, 5 F.4th 1361, 1366 (Fed. Cir. 2021) (explaining that contracting agency "was not obligated to accept a bid that was contrary to the amended terms of its solicitation").  Thus, it was not irrational for the Agency to abandon the corrective action where it reasonably believed an award decision would be legally indefensible, regardless of how close Harmonia believes the Agency was to finishing.  Harmonia's argument that the Agency should have pushed forward instead of cancelling reflects mere disagreement with the Agency's decision, not arbitrary and capricious action.

The Court likewise finds that Harmonia's remaining positions that (a) the corrective action was "painstakingly close" to finishing and (b) cancellation departed from the Agency's representation to the GAO are simply inconsistent with the record.  When the Acting Director decided to cancel the solicitation in late May 2021, the Panel had not yet reconducted Factor 5 oral presentations and still had not submitted a sufficient reevaluation report—both tasks integral to the corrective action, the latter of which the Panel had repeatedly failed to complete.  Thus, it was not irrational for the Agency to conclude that the current Panel (working under the current CO) would not be able to produce a legally defensible technical evaluation report in the two months remaining before the lapse-in-service deadline.  Having twice failed to do so, Harmonia's blanket assumption that further work on the reevaluation report would have been sufficient to satisfy management's concerns is unpersuasive.

Harmonia's argument that the Agency's cancellation decision was inconsistent with its representation to the GAO, and therefore arbitrary and capricious, is similarly unavailing.

27

Harmonia insists that the Agency's notice of corrective action "did not contemplate canceling the awards and the Solicitation *unless* 'the new source selection decision concludes that one or more current awardees no long [sic] represent the best value to the IRS.'"  ECF No. 56 at 23 (emphasis added) (quoting AR 2365).  But that is not a fair reading of the notice.  Although the Agency did indicate to the GAO that it may cancel awards if reassessment during the corrective action indicated that a particular award no longer provided the best value, the Agency did not indicate that this was the *only* circumstance where awards would be cancelled.  Indeed, immediately after the sentence quoted by Harmonia, the Agency reserved the right to take any other appropriate corrective action.  *See* AR 2365 ("The IRS may take *any* additional corrective action it determines to be appropriate.") (emphasis added)).  Harmonia provides no reason why such broad language should not include cancellation of the procurement altogether, and it even conceded at oral argument that cancellation would be a proper form of corrective action if there was a rational basis for it.[8]  The Agency's notice to the GAO simply did not, as Harmonia asserts, commit to cancellation only in more limited circumstances.

Accordingly, the Court finds nothing arbitrary or capricious in the Agency's decision-making process and timing.

---

[8] This is not to say such language grants the Agency "limitless" discretion.  *Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 151 (2010).  "As with all procurement decisions, an agency has broad discretion to take necessary corrective action," *Sys. Application & Techs., Inc. v. United States*, 100 Fed. Cl. 687, 716 (2011) (citing *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 186, 190 (2011)), *aff'd*, 691 F.3d 1374 (Fed. Cir. 2012); however, the chosen corrective action must be "rationally related to the defect to be corrected" and "supported by the evidence in the record," *Sheridan*, 95 Fed. Cl. at 151 (citing *MCII Generator & Elec., Inc. v. United States*, No. 02-85, 2002 WL 32126244 (Fed. Cl. Mar. 18, 2002)); *see also, e.g.*, *Veterans Contracting Grp.*, 920 F.3d at 806–08.  Here, the Agency's decision to cancel and start over with a new evaluation panel and CO is rationally related to the then-existing team's repeated inability to produce defensible evaluations and awards, struggles that are well documented throughout the record.

\*       \*       \*

In sum, based on the record before the Court, Harmonia has not demonstrated that the Agency's decision to cancel was arbitrary and capricious or contrary to law.  The Agency cited legitimate concerns to justify cancelling the solicitation, all of which—besides the bias concern—are supported by the record.  The Agency considered pushing ahead with the corrective action as an alternative option, but reasonably decided to cancel instead.  Harmonia further fails to demonstrate that the process and timing of the Agency's decision was arbitrary or capricious in any manner.

### B.   Harmonia's Claim Under FAR 1.602-2 Mirrors Its Arbitrary-and-Capricious Claim and Therefore Also Fails.

Harmonia also raises a claim under FAR 1.602-2, which requires contracting officers to ensure that contractors receive fair and impartial treatment.  *See* ECF No. 28 ¶¶ 23–31 (alleging the Agency's actions violated its duty to consider bids fairly and honestly); ECF No. 56 at 24–25.  To the extent that FAR 1.602-2 gives rise to a separate claim, such a claim mirrors Harmonia's arbitrary-and-capricious claim.  *See* ECF No. 56 at 24 ("The Agency's decision to cancel the Solicitation was arbitrary and, thus, violated FAR § 1.602-2.").  Therefore, as the Court has found previously, no separate analysis is necessary.  ECF No. 38 at 14 n.7.

### C.   No Injunctive Relief is Warranted Because Harmonia Fails on the Merits.

Because Harmonia has not succeeded on the merits of its protest, and success on the merits is necessary to obtain a permanent injunction, no injunctive relief is warranted in this case.  *See Mitchco Int'l*, 26 F.4th at 1384 n.7 (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)); *ANHAM FZCO v. United States*, 149 Fed. Cl. 427, 439 (2020) (quoting *Dell Fed.*, 906 F.3d at 999).

## IV.  CONCLUSION

The Court finds that the Agency's decision to cancel the solicitation was not arbitrary, capricious, or otherwise unlawful.  Accordingly, Defendant and Peraton's Cross-Motions for Judgment on the Administrative Record (ECF No. 58 & ECF No. 59) are **GRANTED**, and Harmonia's Motion for Judgment on the Administrative Record (ECF No. 56) is **DENIED**.  The Clerk is directed to enter judgment accordingly.

This opinion and order will be unsealed in its entirety after **July 6, 2022**, unless the parties submit **by no later than July 1, 2022**, an objection specifically identifying the protected information subject to redaction.  Any objecting party must submit a proposed redacted version of the decision and provide the reason(s) supporting the party's request for redaction.

**SO ORDERED.**

Dated:  June 22, 2022                               */s/ Kathryn C. Davis*
                                                             KATHRYN C. DAVIS
                                                             Judge